## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF    )
CERTAIN SPECIFIED LOCATIONS    )   Misc. No. **14-2874SAG**
   )
                            TO
                          **14-2885SAG**

### SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

DEC 2 9 2014

## TABLE OF CONTENTS

I.  INTRODUCTION ...........................................................................................................1

II.  BACKGROUND ..........................................................................................................4

III.  THE RICHARD SMITH ORGANIZATION ..............................................................5

    A.  INDICTED DEFENDANTS .................................................................................5

    B.  ELECTRONIC SURVEILLANCE .......................................................................7

    C.  ENFORCEMENT ACTION .................................................................................15

IV.  THE SUBJECT LOCATIONS ...................................................................................15

V.  INDIVIDUAL SUBJECT LOCATIONS ...................................................................18

    A.  1921 WEST BALTIMORE STREET,
        BALTIMORE, MARYLAND 21223 ...............................................................20

    B.  422 EAST 20TH STREET, APARTMENT A,
        BALTIMORE, MARYLAND 21218 ............................................................. 22

    C.  24 NORTH MONROE STREET, BALTIMORE, MARYLAND 21223 ........22

    D.  22 NORTH MONROE STREET, BALTIMORE, MARYLAND 21223 ........25

    E.  4405 MORAVIA ROAD, APARTMENT 2,
        BALTIMORE, MARYLAND 21206 ............................................................. 28

    F.  1821 PENROSE STREET, BALTIMORE, MARYLAND 21223 .............. 33

    G.  4119 MARIBAN COURT, BALTIMORE, MARYLAND 21225 ................... 35

    H.  4306 MAINE AVENUE, GWYNN OAK, MARYLAND 21207 ................. 37

    I.  1917 WEST FAYETTE STREET, BALTIMORE, MARYLAND 21223 ..... 41

    J.  3919 WEST MULBERRY STREET,
        BALTIMORE, MARYLAND 21229 ............................................................. 44

    K.  1840 WEST FAYETTE STREET,
        BALTIMORE, MARYLAND 21223 ............................................................. 46

    L.  4329 CREST HEIGHTS ROAD, BALTIMORE, MARYLAND 21215 .......48

**VI.     "NO KNOCK" REQUEST**..................................................................... 50

**VII.    CONCLUSION**.......................................................................... 53

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **IN THE MATTER OF THE SEARCH OF** | ) | |
| **CERTAIN SPECIFIED LOCATIONS** | ) | Misc. No._____ |
| | ) | |

## SEALED AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

Timothy Moore, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn, deposes and states:

## I.   INTRODUCTION

1.      I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I have been employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since 2007. I have received formal training at the ATF National Academy and the Federal Law Enforcement Training Center.  My primary duties as an ATF Special Agent include investigating violations of federal firearms, narcotics, and Racketeering Influenced and Corrupt Organization laws such as organized criminal enterprises and individuals that engage in illegal firearm trafficking, unlawful possession of firearms, including the possession of firearms during the commission of drug trafficking crimes, home invasion style robberies, and other crimes of violence. During my tenure with ATF, I have participated in numerous federal and state investigations relating to armed individuals who were involved in the distribution of controlled substances, including cocaine, cocaine base, heroin, marijuana and other substances in violation of federal anti-drug laws, including Title 21, United States Code, Section 846 and Title

1

18, United States Code, Sections 922 and 924. In connection with these investigations I have participated in, among other investigative areas, federal and state electronic wire communication intercepts, physical surveillance, the introduction and surveillance of undercover agents, the execution of search and arrest warrants, the recruitment, control, and debriefing of informants, and reviews of records and recorded conversations relating to the aforementioned activities.

3.    This affidavit is being submitted in support of an application for search warrants for the locations set forth below. Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that there is presently concealed in:

> THE LOCATION KNOWN AND DESCRIBED AS **1921 WEST BALTIMORE STREET, BALTIMORE, MARYLAND 21223**, UTILIZED AND/OR OCCUPIED BY BRIAN CARR, BRUCE JEFFRIES AND RICHARD SMITH, the items set forth in **Attachment B**;

> THE LOCATION KNOWN AS **422 EAST 20TH STREET, BALTIMORE, MARYLAND 21218**, UTILIZED AND/OR OCCUPIED BY BRIAN CARR, the items set forth in **Attachment B**;

> THE LOCATION KNOWN AS **24 NORTH MONROE STREET, BALTIMORE, MARYLAND 21223**, UTILIZED AND/OR OCCUPIED BY DARRELL AND PERNELL RANDOLPH, the items set forth in **Attachment C**;

> THE LOCATION KNOWN AS **22 NORTH MONROE STREET, BALTIMORE, MARYLAND 21223**, UTILIZED AND/OR OCCUPIED BY DEDRICK COATES AND VINCENT JONES, the items set forth in **Attachment C**;

> THE LOCATION KNOWN AS **4405 MORAVIA ROAD, APARTMENT 2, BALTIMORE, MARYLAND 21206**, UTILIZED AND/OR OCCUPIED BY RICHARD SMIITH, the items set forth in **Attachment B**;

> THE LOCATION KNOWN AS **1821 PENROSE AVENUE, BALTIMORE, MARYLAND 21223**, UTILIZED AND/OR OCCUPIED BY JAMES BARBER, the items set forth in **Attachment B**;

2

THE LOCATION KNOWN AS **4119 MARIBAN COURT, BALTIMORE, MARYLAND 21225**, UTILIZED AND/OR OCCUPIED BY KEVIN GRAY, the items set forth in **Attachment B**;

THE LOCATION KNOWN AS **4306 MAINE AVENUE, GWYNN OAK, MARYLAND 21207**, UTILIZED AND/OR OCCUPIED BY LISA FOWLKES AND RICHARD SMITH, the items set forth in **Attachment B**;

THE LOCATION KNOWN AS **1917 WEST FAYETTE STREET, BALTIMORE, MARYLAND 21223**, UTILIZED AND/OR OCCUPIED BY ELDRIDGE DUBOIS, the items set forth in **Attachment B**;

THE LOCATION KNOWN AS **3919 WEST MULBERRY STREET, BALTIMORE, MARYLAND 21229**, UTILIZED AND/OR OCCUPIED BY WALTER TIMMONS, the items set forth in **Attachment B**;

THE LOCATION KNOWN AS **1840 WEST FAYETTE STREET, BALTIMORE, MARYLAND 21223**, UTILIZED AND/OR OCCUPIED BY TIMON MCRAE, the items set forth in **Attachment B**;

THE LOCATION KNOWN AS **4329 CREST HEIGHTS ROAD, BALTIMORE, MARYLAND 21215**, UTILIZED AND/OR OCCUPIED MARVIN GERMANY, the items set forth in **Attachment B**;

all of which constitute evidence, fruits, and instrumentalities of, inter alia, violations of Title 21, United States Code, Sections 841(a)(1) and 846, which prohibit the distribution, possession with intent to distribute, and conspiracy to distribute and possess with intent to distribute controlled substances; and use of a communication facility to facilitate this offense, in violation of Title 21 United States Code Section 843, collectively the "TARGET OFFENSES".

    4.    I have personally participated in this investigation and make this affidavit based on my personal participation in this investigation and based upon reports made to me by other law enforcement agents. Except where otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Unless otherwise noted, wherever in this affidavit I asserted that a statement was made, the

statement was made by another law enforcement officer (any of whom I have had either direct or hearsay knowledge of that statement) to whom other law enforcement officers or I have spoken with, or whose reports I have read and reviewed. Such statements are reported in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance. Any quotations are based only on paraphrasing or transcripts of the actual content.

5.      Because this Affidavit is being submitted for the limited purpose of establishing probable cause for warrants to search the locations set forth above (collectively, the "SUBJECT LOCATIONS"), I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause.

## II.   **BACKGROUND**

6.      As set forth in further detail below, ATF Baltimore Group III has been conducting an investigation of the narcotics activities of Richard SMITH and his associates, who collectively constitute a drug trafficking organization (DTO), (hereinafter SMITH DTO). The investigation to date, which has included surveillance, search warrants, the use of a GPS tracking device, narcotics purchases made by an undercover ATF Task Force Officer (TFO) and a confidential informant (CI), debriefings of confidential informants, and the interception of wire communications, has revealed that SMITH is orchestrating the distribution of significant amounts of heroin in and around the city of Baltimore, Maryland. Investigators have learned the SMITH DTO regularly

employs firearms in defense of their operation, a fact which leads the SMITH DTO to frequently be in conflict with competing drug trafficking operations. Investigators have determined the operations of the SMITH DTO to be extensive in its reach, to the point where it is pervasive in the Western Police District of Baltimore, with associated drug trafficking shops located in the Southern and Southwest Police Districts as well.

## III.   THE RICHARD SMITH ORGANIZATION

### A.   INDICTED DEFENDANTS:

7.     On December 10, 2014, the following members of the SMITH DTO were indicted by a federal grand jury for violations of 21 U.S.C. 846. It should be noted that the following indicted persons are not an all-inclusive list of those that are members of the SMITH DTO:

a.     Richard SMITH, aka "Fat Sam," aka "Fat Boy," has been identified as the leader of the SMITH DTO. SMITH oversees the distribution activities of a large drug trafficking operation centered in the west side of Baltimore, Maryland. Investigators believe that SMITH orchestrates the acquisition of heroin for said operation, and acts as the final arbiter for organizational decisions. An inquiry into SMITH's criminal history revealed two convictions for Possession with the Intent to Distribute CDS.

b.     Brian CARR, aka "Big Brother," aka "Boog," has been identified as a lieutenant of SMITH's and a supervisor in the SMITH DTO. An inquiry into CARR's criminal history revealed he has convictions for Unlawful Possession of CDS and Unauthorized Removal of Property.

c.     Bruce JEFFRIES has been identified as lieutenant of SMITH's and a supervisor in the SMITH DTO. An inquiry into JEFFRIES' criminal history revealed he has a

federal conviction for Possession with the Intent to Distribute Heroin.

        d.      Darrell RANDOLPH, aka "Relly," has been identified as one of the mid-level managers and a seller for the SMITH DTO. An inquiry into RANDOLPH's criminal history revealed two convictions for Possession with the Intent to Distribute CDS.

        e.      Pernell RANDOLPH, aka "Perc," has been identified as one of the mid-level managers and a seller for the SMITH DTO. An inquiry into RANDOLPH's criminal history revealed convictions for Possession with the Intent to Distribute CDS and Conspiracy to Commit First Degree Assault.

        f.      Brian NETTELES , aka "Lil Cocky" aka "Mike" has been identified as a narcotics seller for the SMITH DTO. An inquiry into NETTLES' criminal history revealed convictions for Vehicular Manslaughter and Unauthorized Removal of Property.

        g.      Eldridge DUBOIS aka "Sput," has been identified as a lieutenant of the SMITH DTO who oversees street-level operations. An inquiry into DUBOIS' criminal history revealed a federal conviction for Possession with the Intent to Distribute Cocaine and one state conviction for Possession with the Intent to Distribute CDS.

        h.      James BARBER aka "Nook," has been identified a street-level manager for the SMITH DTO. An inquiry into BARBER's criminal history revealed two convictions for Distribution of CDS.

        i.      Walter TIMMONS aka "Money" aka "Do Right" has been identified as a narcotics seller for the SMITH DTO. An inquiry into TIMMONS' criminal history revealed three convictions for Possession with the Intent to Distribute CDS.

j.      Dedrick COATES aka "Ticket," has been identified as a narcotics seller for the SMITH DTO. An inquiry into COATES' criminal history revealed four convictions for Distribution of CDS.

k.      Vincent JONES aka "Cuddy," has been identified as a narcotics seller for the SMITH DTO. An inquiry into JONES' criminal history revealed one conviction for Possession with the Intent to Distribute CDS and five convictions for Unlawful Possession of CDS.

l.      Marvin GERMANY has been identified as a mid-level manager and a narcotics seller for the SMITH DTO. An inquiry into GERMANY's criminal history revealed one conviction for Armed Robbery.

m.      Kevin GRAY aka "Skeeter," has been identified as a narcotics seller for the SMITH DTO. An inquiry into GRAY'S criminal history revealed three convictions for Possession with the Intent to Distribute CDS.

n.      Derek SHORTS aka "P" aka "Pumpkin," has been identified as a stash house operator for the SMITH DTO. An inquiry into SHORTS' criminal history revealed seven convictions for Possession with the Intent to Distribute CDS.

## B.      ELECTRONIC SURVEILLANCE

8.      On September 22, 2014, the Honorable Richard D. Bennett authorized interception of wire and electronic communications occurring over the cellular telephone assigned call number 443-898-2755 (TARGET TELEPHONE 1), which was utilized by Brian NETTLES, and wire and electronic communications over the cellular telephone assigned call number (410) 419-1881 (TARGET TELEPHONE 2), which was utilized by Darrell RANDOLPH. (MISC. NO.14-458) This authorization expired on October 21, 2014, at 11:59 p.m. and was not renewed. NETTLES

7

discontinued use of TARGET TELEPHONE 1 before monitoring could begin and, as such, no interception ever occurred over TARGET TELEPHONE 1. During the period of interception on TARGET TELEPHONE 2, agents obtained evidence concerning the TARGET OFFENSES with members of the SMITH DTO. Summaries of some of the pertinent calls intercepted TARGET TELEPHONE 2 are set forth below.

9.      On September 23, 2014, at approximately 9:31 a.m., Darrell RANDOLPH received an incoming call on TARGET TELEPHONE 2 from Bruce JEFFRIES.[1] During the call, JEFFRIES told RANDOLPH, "Jig watching yo, and he's saying the same thing I'm saying, ain't nobody watching Marvin while in the alley yo. Ain't no way in the world niggas should be all in that store right there while a nigga hittin yo." RANDOLPH replied, "Alright, I got it." I believed, based on knowledge, training, and experience, that during this call, JEFFRIES called RANDOLPH to notify him that "Jig" (known as Bernard KINGSBOROUGH, an unindicted leader of the SMITH DTO) was in the area and was displeased with what he saw, namely that most of the SMITH DTO's sellers were in a corner store talking while Marvin GERMANY was distributing narcotics in a nearby alley without anyone looking out for him. This was unacceptable to JEFFRIES and KINGSBOROUGH because, as agents know, DTO's typically like to have at least one or two persons looking out for police and/or persons attempting to steal narcotics while their sellers are out on the street distributing narcotics to customers. The SMITH DTO operates in this manner, which is why JEFFRIES and KINGSBOROUGH were upset, because the practice was not being followed at that time.

---

1 Unless otherwise indicated, all calls made or received by Darrell RANDOLPH occurred over TARGET TELEPHONE 2.

8

10.     On September 24, 2014, at approximately 7:20 a.m., Darrell RANDOLPH received a call from Bruce JEFFRIES. During the call, JEFFRIES asked RANDOLPH, "Yo, what's the count?" RANDOLPH replied "8." RANDOLPH then asked JEFFRIES, "… what to do with them thirties? It's thirty in each one." JEFFRIES asked RANDOLPH to confirm what he just said, to which RANDOPLPH responded, "… it's thirty in four of 'em and the other four is regular twenty-five." JEFFRIES told RANDOLPH that the quantities were correct and explained, "We did that shit because that shit was off yesterday as far as when we was giving out all that shit." RANDOLPH then asked, "So what, they supposed to come back two-fifties?" JEFFRIES responded, "Yeah, just um, fuck with the twenty-five until I get down there yo and I can tell you face to face." I believed, based on training, knowledge, and experience, that during this call, JEFFRIES called RANDOLPH to inquire how many packs of heroin-filled gelcaps were still on site and ready for sale. RANDOLPH's response indicated that there were four packs each containing twenty-five gelcaps and four more packs that each contained thirty gelcaps. RANDOLPH was confused as to why there were packages containing thirty gelcaps because the packs typically contained twenty-five gelcaps. RANDOPLH also asked what the proceeds from the thirty-packs should equal out to, as the SMITH DTO would let their sellers keep fifty dollars from each twenty-five pack of narcotics sold, which typically worked out to fifty dollars for the seller and two hundred dollars for the DTO from the sale of each twenty-five pack of gelcaps. JEFFRIES told RANDOLPH to sell the twenty-five count packs until he arrived and he would then explain to RANDOLPH face to face how much money should come back from each thirty pack. Furthermore, agents believed JEFFRIES explanation as to the presence of the thirty-packs was because the previous day the SMITH DTO had given out free samples of narcotics to entice

9

their customer base (commonly referred to as "testers") and, as such, that threw off their regular process of putting twenty-five gelcaps in each pack.

11.     On October 13, 2014, at approximately 4:00 p.m., Darrell RANDOLPH received a call from 443-883-1264, a number used by a male CDS purchaser known only as "Mike." During the call, "Mike" asked RANDOLPH, "Uhh, you out, you around?" RANDOLPH replied, "Anybody, everybody got nothing. My man is putting some shit together now." "Mike" then asked, "You think you'll be ready in a half hour?" RANDOLPH responded by telling him, "Nah, I don't know about no half an hour, but you know a nigga, they be like putting together like fifty grams and shit." Based your my training, knowledge, and experience, I believed that "Mike" is a CDS customer of RANDOLPH's and he called to see if RANDOLPH had any heroin for sale. Furthermore, based on RANDOLPH's response, nobody amongst the SMITH DTO'S sellers had any heroin for sale at that time because the upper management (JEFFRIES, SMITH and CARR) were currently in the process of taking fifty grams of raw heroin, diluting it with cutting agents to make the fifty grams into a significantly larger amount, and then packaging the new mixture in gelcaps that would be ready for street-level distribution.

12.     On October 10, 2014, the Honorable Richard D. Bennett authorized interception of wire and electronic communications occurring over the cellular telephone assigned call number 443-468-7228 (TARGET TELEPHONE 3), which was being utilized by Bruce JEFFRIES. (MISC. NO. 14-491). On November 12, 2014, the Honorable Richard D. Bennett authorized the continued interception of wire and electronic communications occurring over the cellular telephone assigned call number 305-216-4195, TARGET TELEPHONE 3. The number of TARGET TELPHONE 3 changed during the course of this investigation; however, the electronic

10

serial remained the same and interception continued pursuant to the Court's Orders. JEFFRIES

ceased using TARGET TELEPHONE 3 on November 18, 2014, after investigators raided one of

the DTO's main drug stash houses and interception of TARGET TELPHONE 3 ceased on

November 28, 2014. During the period of interception on TARGET TELEPHONE 3, agents

obtained evidence concerning the TARGET OFFENSES with members of the SMITH DTO.

Summaries of some of the pertinent calls intercepted are set forth below.

13.     On October 19, 2014, at approximately 11:22 p.m., JEFFRIES called Derek

SHORTS, who is one of the organization's stash house operators.[2] During the call, JEFFRIES

asked SHORTS, "You seen anybody?" SHORTS replied, "No, not yet. I'll see him in the

morning... you want me to see him tonight?" JEFFRIES replied, "Yeah, probably so. I'm going to

find out in a minute." In the background with JEFFRIES, Richard SMITH could be heard asking

JEFFRIES, "How many, ask him did he got all the jiffies?" At this point JEFFRIES asked

SHORTS, "You got all of them?" SHORTS replied, "No, uh, uh, I took eight and left eight there."

JEFFRIES then relayed that message to SMITH, who could be heard saying, "Alright." Based on

my knowledge, training, and experience, I believed that during this call SMITH and JEFFRIES

inquired with SHORTS to see how many packs of narcotics ("jiffies") he had stored at his location

so the organization's sellers would have product to distribute early the next morning. Throughout

this investigation, the SMITH DTO members repeatedly refer to packages of narcotics as "jiffies"

and "joints." Furthermore, I believed that SHORTS told JEFFRIES he took eight packs from a

second stash house ("I took eight and left eight there") and brought the eight packages to his

residence, while leaving the other eight packs at the secondary stash house. Based on surveillance

2 Unless otherwise indicated, all calls made or received by Bruce JEFFRIES occurred over
TARGET TELEPHONE 3.

11

and a number of other intercepted calls, agents believe this secondary stash house to be a nearby location.

14.     On October 30, 2014, at approximately 5:29 p.m., JEFFRIES called Darrell RANDOLPH. During the call, JEFFRIES asked RANDOLPH where he was and RANDOLPH responded by saying, "Right here on Monroe Street." JEFFRIES said, "I'm on Monroe Street, so where at on Monroe Street?" RANDOLPH replied, "I'm talking about riding down Monroe Street," JEFFRIES said, "I'm trying to figure out why ain't nobody out here selling dope yo. I'm like, nobody out here, nobody. Not one nigga out here yo." RANDOLPH replied, "Ticket on a dirt bike, Pernell was just, Pernell just pulled up right there." JEFFRIES responded by saying, "What the fuck is his fat ass doing on a dirt bike? Niggas need to start, yo, alright. Ok, alright, alright." Based on my knowledge, training, and experience, I believed that during this call, JEFFRIES called RANDOLPH to complain that there were no SMITH DTO members out on the street distributing heroin when he was walking around checking on business. RANDOLPH's reply indicated that he had previously seen his brother, Pernell RANDOLPH, as well as Dedrick COATES ("Ticket") out on the block selling narcotics before he had momentarily left the area.

15.     On November 16, 2014, at approximately 10:13 a.m., JEFFRIES called Derek SHORTS. During the call, JEFFRIES asked SHORTS, "What's left over there man? I know how many, I just wanna hear you say it" SHORTS replied, "Five and the little ten packs." JEFFRIES then asked, "What you mean uh, you said it's five?" SHORTS responded, "Yeah it's five. I gave the other, all the rest of them out yesterday." JEFFRIES then asked, "What, you mean there's only five packs or five full packs?" SHORTS confirmed it was "five full packs" which prompted JEFFIRES to ask, "So there's twenty pills, uh, I mean twenty packs left?" SHORTS confirmed

12

same, at which time JEFFRIES told him to, "...take them niggas eight of them." Based on my knowledge, training, and experience, I believed that during this call, JEFFRIES called SHORTS (a stash house operator) to confirm that there were still twenty packs of narcotics remaining, each of which contained twenty-five heroin filled gelcaps, a fact which SHORTS confirmed. After verifying that fact, JEFFRIES instructed SHORTS to bring eight of those packs to the SMITH DTO sellers who were distributing narcotics around the corner from SHORTS' residence so they would not run out of product to sell.

16.     On October 31, 2014, the Honorable Richard D. Bennett authorized interception of wire and electronic communications occurring over the cellular telephone assigned call number 443-762-8496 (TARGET TELEPHONE 4), which was utilized by Brian CARR. (MISC. NO. 14-529). This authorization expired on November 29, 2014, at 11:59 p.m., and was not renewed. During the period of interception on TARGET TELEPHONE 4, agents obtained evidence concerning the TARGET OFFENSES with members of the SMITH DTO. Summaries of some of the pertinent calls intercepted are set forth below.

17.     On November 5, 2014, at approximately 7:22 p.m., CARR received an incoming call on TARGET TELEPHONE 4 from Kevin GRAY.[3] During the call, GRAY asked CARR, "Where the fuck we put them joints at that we already opened up... I'm talking about the joints that we had already opened?" CARR replied, "It was in the bag." GRAY asked, "In the book bag, right?" CARR confirmed. GRAY then said, "It ain't in there" CARR replied, "You took them out." GRAY replied, "Oh yeah! Yeah, yeah, yeah, I got em." Based on my knowledge, training, and experience, I believed that during this call, GRAY called CARR to ask about the location of

_____

3 Unless otherwise indicated, all calls made or received by Brian CARR occurred over TARGET TELEPHONE 4.

13

the packs of narcotics ("joints") that they had previously started to sell. Apparently, GRAY had forgotten that he had previously removed them from a book bag they were being stored in, a fact which CARR reminded him of.

18.   On November 7, 2014, at approximately 10:15 a.m., CARR received a call from 717-537-5797, a number utilized by an unknown male known only as "Chris" who is believed to be a CDS purchaser. During the call, "Chris" told CARR, "It's Chris, um, ya I'm coming back through. I need six more" CARR replied, "Alright... park, park on Fayette yo, past the light." Based on my knowledge, training, and experience, I believed "Chris" is one of CARR's regular narcotics purchasers who had just recently bought heroin from CARR and called CARR back to inform CARR that he ("Chris") was coming back to purchase six more heroin-filled gelcaps.

19.   On November 18, 2014, at approximately 2:35 p.m., CARR called Richard SMITH. During the call, CARR asked, "Hey yo, is it down the way?" SMITH replied, "Yeah... you gotta hold up yo. Those motherfucking people just ran down on Big P and I think they getting ready to go up in Uncle Fell's shit." CARR said, "Ahh shit, alright." Based on my knowledge, training, and experience, I believed that during this call, CARR called SMITH to confirm the location of narcotics that he (CARR) was getting ready to pick up for his distribution activities. SMITH confirmed the narcotics were at the location ("down the way") but SMITH told CARR that his acquisition would have to wait because the police had just executed a search warrant at Derek SHORTS' ("Big P") house, one of the SMITH DTO's stash houses, and were getting ready to enter a second stash house ("Uncle Fell's shit"). As such, it would have been ill-advised for CARR to enter the area and impossible to get the narcotics he was seeking. It should also be noted that the search warrant mentioned above is described in more detail below in paragraph 20.

14

C.   **ENFORCEMENT ACTION**

20.   On November 18, 2014, based on a series of intercepted incoming and outgoing between JEFFRIES on TARGET TELEPHONE 3 and Derek SHORTS, agents executed a search warrant at 1914 West Baltimore Street, Baltimore, Maryland, which is a residence utilized by SHORTS. During the previous days and weeks, agents had become aware that SHORTS was acting as a stash house custodian for the SMITH DTO and was, on a daily basis, storing large amounts of heroin for the SMITH DTO, therefore investigators sought a search warrant. As a result of that warrant, agents recovered approximately four hundred heroin-filled gelcaps and a small assortment of ammunition with calibers ranging from .357, 9mm, and various gauge shotgun shells, along with one hundred heroin-filled gelcaps recovered from SHORTS. This search warrant caused JEFFRIES to discontinue using TARGET TELEPHONE 3, but it did not stop the narcotics distribution activities by the SMITH DTO for more than a few hours, as the organization has multiple stash houses, each with a significant amount of heroin ready for distribution.

IV.   **THE SUBJECT LOCATIONS**

21.   Based on the information set forth elsewhere in this affidavit, my knowledge, training and experience, my previous participation in narcotics investigations, and my conversations with other law enforcement officers, I respectfully submit that there is probable cause to believe that the SUBJECT LOCATIONS are locations being used for the storage and distribution of narcotics, narcotics proceeds, and the facilitation of narcotics offenses.

22.   Based upon my training and experience, as well as my participation in this and other narcotics investigations, as well as my conversations with other agents, I know the following:

15

a.      Persons involved in the illegal distribution of controlled dangerous substances (CDS) keep and maintain records of their various activities. Experience in similar cases has established that such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms. Documents commonly concealed by traffickers include, but are not limited to, notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders, and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. The aforementioned items are kept in locations that are considered safe by the drug traffickers, such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them. I know that drug traffickers often have several residences, thereby decreasing the likelihood of detection by law enforcement.

b.      Persons involved in the illicit distribution of CDS, due to advancement in technology, may be utilizing computers, smartphones, iPads or tablets, external hard drives, flash drives, or other electronic storage media to store the records listed above.

c.      I also know, based on training and experience, that large scale drug traffickers must maintain on hand large amounts of United States currency in order to maintain and to finance their ongoing narcotics business. Based on training and experience, I know that persons involved in large scale drug trafficking conceal in their residences currency, financial instruments, and evidence of financial transactions relating to narcotics trafficking activities.

16

d.     Persons involved in the illicit distribution of CDS utilize cellular telephones and other electronic communication devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals.

e.     Persons involved in the illicit distribution of CDS take, or cause to be taken, photographs of themselves, their associates, their property and their product. These traffickers usually maintain these photographs in their possession, in locations such as their homes, vehicles, electronic devices, or on their person.

f.     I know based on training and experience that drug traffickers commonly have in their possession, that is, on their person, in their residences, and/or businesses, firearms and other weapons. Said firearms and weapons are used by the traffickers to protect and secure their large amounts of narcotics and United States currency from loss to law enforcement agents or other members of the criminal element that are motivated by greed.

g.     I know, based on training and experience, that drug traffickers commonly have in their possession, that is, on their person, in their residences and/or businesses, packaging material, cutting agents, digital scales, and other items used in the preparation and packaging of controlled substances.

h.     Narcotics traffickers commonly maintain the foregoing items inside combination or key-lock safes or strong boxes, suitcases, locked cabinets, and other types of locked or closed containers, or hidden compartments, which are secreted in locations such as the SUBJECT LOCATIONS, where they may maintain these items securely.

17

## V.    INDIVIDUAL SUBJECT LOCATIONS

### A.    1921 WEST BALTIMORE STREET, BALTIMORE, MARYLAND 21223

23.     The location is described as a three-story, brown, end-unit row home. The numerals "1921" are displayed to the right of the white front storm door. The front porch has a fence around it with three columns supporting the roof over the porch. The second and third stories have three windows each. 1921 West Baltimore Street is a residence known to be utilized by Brian CARR, Richard SMITH and Bruce JEFFRIES. CARR used 1921 West Baltimore Street for official Baltimore City Court proceedings as recently as his last arrest, which occurred on August 26, 2014. CARR has his Maryland Driver's License registered to this address. Finally, GPS tracking information on the phones of JEFFRIES, SMITH and CARR have placed these individuals at this location on multiple occasions throughout the course of the investigation, oftentimes in the late evening and early morning hours.

24.     Agents have observed CARR and SMITH entering and exiting the residence on multiple occasions throughout the investigation. They have also seen JEFFRIES, NETTLES, GILLIARD, KINGSBOROUGH and SHORTS on the front porch or front steps on numerous occasions. On October 16, 2014, CARR was observed entering the residence. Additionally, based on numerous calls intercepted over TARGET TELEPHONES 2, 3 and 4, and which were corroborated with surveillances when possible, agents believe that SMITH, CARR and JEFFRIES, among others, use 1921 West Baltimore Street as a primary base of operations from which they collect money, make supervisory phone calls, conduct supervisory activities, and hold meetings with members of the SMITH DTO. Throughout the investigation, and on a number of occasions, JEFFRIES used TARGET TELEPHONE 3 to contact other SMITH DTO associates,

18

such as DUBOIS, NETTLES, Darrell RANDOLPH, among others, to notify them that SMITH was in the 1900 block of West Baltimore Street and he wanted to speak to his employees regarding his narcotics operation. I believe SMITH was using 1921 West Baltimore Street as a location in which he could hold these meetings.

25.     On October 19, 2014, at approximately 11:22 p.m., JEFFRIES called Derek SHORTS. This call is referenced in paragraph 15 and during the call, JEFFRIES and SMITH inquired from SHORTS the amount of narcotics located at the stash house operated by SHORTS. During the call, I believed that SHORTS told JEFFRIES and SMITH that he removed eight packages of narcotics from a secondary SMITH DTO stash house to keep at his house and left another eight packages of narcotics at the secondary stash house. Based on surveillance and a number of other intercepted calls, agents believe this secondary stash house to be 1832 West Baltimore Street, Baltimore, Maryland. SHORTS' residence, the secondary stash house at 1832 West Baltimore Street, and a tertiary stash house at 1930 West Baltimore Street, can all be overseen and supervised from 1921 West Baltimore Street. Therefore, your I believe SMITH, JEFFRIES, CARR, and others, operate from 1921 West Baltimore Street because of its central location with regards to the organization's operations. Furthermore, agents believe 1921 West Baltimore Street is being utilized as a base of operations for the SMITH DTO and, as such, is likely to contain narcotics, narcotics proceeds, and other instrumentalities of narcotics trafficking.

26.     During surveillance conducted on October 16, 2014, a call was intercepted over TARGET TELEPHONE 3 during which JEFFRIES told SHORTS, "I need one, what you got, where you got (inaudible)?" SHORTS asked, "One?" JEFFRIES confirmed his request and then said, "Relly, he right here on Bmore... be careful how you move, be careful how you move

19

because Fat Boy on Bmore street too." Based on my knowledge, training, and experience, I believed the above call was placed to SHORTS by JEFFRIES to instruct SHORTS to bring one pack of narcotics out for Darrell RANDOLPH ("Relly"), who would be waiting one door down from 1921 West Baltimore Street. Furthermore, JEFFRIES warned SHORTS about being flippant in his handling of the narcotics because Richard SMITH ("Fat Boy") was out and would be watching. SA Troy Dannenfelser, who was conducting surveillance of 1921 West Baltimore Street during this call, observed JEFFRIES standing on the steps of 1921 West Baltimore Street while SMITH, CARR, and others were sitting on the porch of same. During surveillance, CARR retrieved mail from the mailbox of 1921 West Baltimore Street and let himself into the residence. SA Dannenfelser was also able to observe the narcotics handoff between SHORTS and RANDOLPH that was described above, a transaction which JEFFRIES personally supervised.

27.     On November 4, 2014, JEFFRIES spoke to DUBOIS and told him (DUBOIS) that "Fat Ass" (a reference to SMITH)" was on "B'More." And again on November 17, 2014, JEFFRIES called DUBOIS and told him, "Bmore." DUBOIS asked, "Bmore?" and JEFFRIES confirmed. DUBOIS then asked "he (Smith) got my fifty dollars for me?" and JEFFRIES replied "ya." DUBOIS then stated, "I'm ready to come get it." Based on my knowledge, training and experience, I believe that in the above calls JEFFRIES was instructing DUBOIS to meet SMITH at 1921 West Baltimore Street, the centrally located location where agents routinely see him and other members of the organization meeting, and the location used by the organization to conduct their drug business, which would include paying DUBOIS. Further, in the latter call, I believe DUBOIS was asking JEFFRIES whether SMITH had the fifty dollars that he (SMITH) owed him (DUBOIS) because the only people known to have paid DUBOIS for his (DUBOIS') drug

20

trafficking work have been JEFFRIES and SMITH.   By process of elimination, I believe SMITH (the "he" referenced in the call) was preparing to pay DUBOIS at 1921 West Baltimore Street.

28.     Based on this intercepted call and the observations of SA Dannenfelser, I believe that JEFFRIES, among others, utilizes this location to oversee the operations of the SMITH DTO.

29.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **1921 WEST BALTIMORE STREET**, the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of the TARGET OFFENSES.

**B.     422 EAST 20TH STREET, APARTMENT A, BALTIMORE, MARYLAND 21218**

30.     The location is described as a three story, red brick middle-unit row house. The numerals "422A" are in gold on the glass above the green entry door. The residence is known to be utilized by Brian CARR, who most recently was observed entering/exiting the residence on December 4, 2014.

31.     On October 31, 2014, at approximately 5:35 p.m., CARR called James BARBER. During the call, CARR told BARBER, "Pretlow owe me one-twenty yo, tell him…Pretlow owe me one-twenty. Tell him we ain't taking no more shorts." BARBER replied, "Alright, alright, alright, I'm walking up to him now yo." Based on my knowledge, training, and experience, I believed that during this call, CARR called BARBER to inform him that George PRETLOW (an unindicted associate of the SMITH DTO) owed CARR one hundred and twenty dollars for narcotics sales that he (PRETLOW) had previously conducted. Furthermore, I believed CARR told BARBER to tell PRETLOW that they were not to give any more discounts on narcotics sales ("no more shorts") because they had already given too many discounts that day and it was

21

affecting their profits. Additionally, agents believe BARBER is a mid-level supervisor based on the fact that throughout this investigation CARR consistently dispensed orders to him with the intention that BARBER pass those orders on to the street-level workers.

32.     On November 4, 2014, at approximately 7:29 p.m., CARR called Kevin GRAY. During the call, GRAY told CARR, "I'm in the crib...I put the joints up yo." CARR replied, "Alright, I'm a see you, I'm a see you, I'm a see you in the morning." GRAY then asked, "Well you, you going, you gonna come get me or you want me to meet you out?" CARR told GRAY, "I gotta find a ride. I probably, I, I, I, gotta, I gotta find. Do you, who got something left?" GRAY replied, "Um, Nook. Nook that um, the, the, the joint. Nook got everything. I told him, I told him take it in the house. I didn't want to leave that shit outside." Based on my knowledge, training, and experience, I believed that during this call, GRAY called CARR at the end of that days' business to notify him that he (GRAY) had taken his remaining narcotics into his residence for the night. When CARR asked GRAY if anyone else had any narcotics ("Who got something left?") GRAY informed CARR that BARBER ("Nook") had taken all the remaining narcotics inside his (BARBER's) house at GRAY's direction because he did not want the narcotics to remain hidden outside.

33.     On November 18, 2014, at approximately 2:35 p.m., CARR called Richard SMITH. During the call, CARR asked "Hey yo, is it down the way?" SMITH replied, "Yeah... you gotta hold up yo. Those motherfucking people just ran down on Big P and I think they getting ready to go up in Uncle Fell's shit." CARR said, "Ahh shit, alright." Based on my knowledge, training, and experience, I believed that CARR initially called SMITH to confirm the location of narcotics that he (CARR) was getting ready to pick up for his distribution activities. Furthermore,

22

I believed SMITH told CARR that the acquisition would have to wait because the police had just executed a search warrant on one of the SMITH DTO's stash houses and they were getting ready to enter a second stash house. As such, it would have been ill-advised for CARR to enter the area and impossible to get the narcotics he was in need of, as the police seized and were in possession of said narcotics.

34.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **422 EAST 20th STREET, APARTMENT A**, the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of the TARGET OFFENSES.

### C.     24 NORTH MONROE STREET, BALTIMORE, MARYLAND, 21223

35.     The location is described as a two-story grey and tan brick middle-unit row house, with an off-white front door. The numerals "24" are carved into a stone on the left side of the front door, underneath the black front porch lamp. Two front rectangular windows are on the first floor and are separated by brick. The two basement windows are made of glass cubes and are separated by grey brick. The residence is known to be utilized by Darrel RANDOLPH and his brother Pernell RANDOLPH, as well as Marvin GERMANY on occasion. Darrell RANDOLPH used 24 North Monroe Street for official Baltimore City Court proceeding during his most recent arrest, which was on October 13, 2014. Darrell RANDOLPH has this location listed on his Maryland Driver's License. Agents have observed both Darrell and Pernell RANDOLPH enter and exit 24 North Monroe Street on numerous occasions, as recently as December 3, 2014. During surveillance conducted on October 21, 2014, your affiant and other law enforcement personnel observed both Darrell and Pernell RANDOLPH enter and exit 24 North Monroe Street on multiple

23

occasions. On that same date, both Pernell and Darrell RANDOLPH were observed conducting multiple hand to hand narcotics transactions while frequently entering and exiting 24 North Monroe Street. Calls intercepted over TARGET TELEPHONE 2 and TARGET TELEPHONE 3 corroborates these observations of narcotics distribution activities.

36.     On numerous occasions throughout this investigation, a confidential informant has conducted controlled purchases of narcotics from Darrell RANDOLPH, oftentimes within one block of his front door. More specifically, said informant has purchased heroin from Darrell RANDOLPH on August 12, August 15, and August 22, 2014, for a total of 89 gelcaps containing suspected heroin. These purchases took place just blocks from 24 North Monroe Street.

37.     On October 20, 2014, at approximately 10:10 p.m., Darrell RANDOLPH received a call from Vincent JONES. During the call, JONES asked RANDOLPH, "Where that joint at man…Where the uh, where'd ya put the charms at man?" RANDOLPH asked, "What, the readies?" JONES replied, "No, where my joint at?" This question prompted RANDOLPH to question, "The dopes?" JONES then said, "The pack, yeah." RANDOLPH replied, "Alright, I got to call "P" man." JONES said, "Alright man, go ahead and call him yo cause yeah, I need that now. ASAP." Based on my knowledge, training, and experience, I believed that during this call, JONES told RANDOLPH that he needed a fresh pack of twenty-five heroin-filled gelcaps because he had customers ready to purchase them and JONES believed that RANDOLPH had narcotics stashed and ready for distribution at his house. RANDOLPH told JONES that he would have to call Derek SHORTS ("P") to tell him to give a pack to JONES, as SHORTS was keeping the packs at his residence and RANDOLPH was, at this time, out of narcotics. Based on this call and observations made by investigators of both RANDOPLH's distribution activities, I believe that both

24

RANDOPLHS often keep narcotics stored at 24 North Monroe Street that are ready for street level distribution.

38.     In addition to narcotics, I also believe that Darrell RANDOLPH stores firearms at his residence. On October 15, 2014, at approximately 8:25 p.m., Darrell RANDOLPH called unknown male. During the call, RANDOLPH told the male, "Yo I need to hold one of them jiz joints right for a little bit baby." The male replied, "I only got one. You know I only got that deuce deuce with the shells for real." Later in the conversation RANDOLPH said, "...Like I'm trying, I really need it though my nigga like, it's, it's like, it's like if I get these other joints then I'm gonna be good though but like I really need that." The male asked, "Don't you got like eight of them?" RANDOLPH replied, "I'm saying though, yeah but they, they all out like I mean I can't get in contact with the people that got em." Based on my training, knowledge, and experience, I believed that during this call RANDOLPH called the unknown male to request that the male loan him a firearm for a short time. The male protested, saying that he only had one .22 caliber firearm ("the deuce deuce") and then asked RANDOLPH why he needed his firearm when he (RANDOLPH) allegedly had eight firearms ("don't you got like eight of them?"). I believe RANDOLPH's reply indicates that he does, in fact, have multiple firearms but at that time they were currently on loan to associates of his that he could not reach at that moment, hence the need to borrow one from the unknown male.

39.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **24 NORTH MONROE STREET**, the items set forth in Attachments C, which constitutes evidence, fruits and/or instrumentalities of violations of the TARGET OFFENSES. Additionally, based on the previous call regarding

25

firearms and the calls listed below in paragraphs 42 and 43, I respectfully submit that there is probable cause to believe that **24 NORTH MONROE STREET** will also contain evidence of violations of 18 United States Code Sections 922 and 924.

**D.**      **22 NORTH MONROE STREET, BALTIMORE, MARYLAND 21223**

40.      The location is described as a two-story grey and tan brick middle-unit row house, with a tan front door. The numerals "22" are vertically displayed in gold on the front door. The ground floor and basement windows are secured with black metal bars. The first floor front window has a half circle window on top of it, with tan trim. The residence is known to be utilized by Dedrick COATES and Vincent JONES.

41.      Agents have observed both COATES and JONES enter and exit 22 North Monroe Street on numerous occasions, and both were observed as recently as November 25, 2014. During a surveillance conducted on October 21, 2014, both COATES and JONES were observed conducting multiple hand to hand narcotics transactions while often entering and exiting 22 North Monroe Street. Calls intercepted over TARGET TELEPHONE 2 and TARGET TELEPHONE 3 corroborates these observations of narcotics distribution activities.

42.      On October 10, 2014, at approximately 7:22 p.m., DUBOIS called Darrell RANDOLPH. During the call, DUBOIS asked RANDOLPH, "…where you at… you got the gun with you?" RANDOLPH replied, "I got the uhh, the old rusty one." DUBOIS asked, "Man, why ain't nobody go get the .40 yo?" RANDOLPH responded, "Cuddy wasn't trying to give it to me." Based on my knowledge, training and experience, I believed that the above call was a request by DUBOIS to RANDOLPH to bring a firearm to him (DUBOIS). When RANDOLPH replied he only had a rusty firearm ("the old rusty one"), DUBOIS got upset and questioned RANDOLPH as

26

to why the .40 caliber handgun was not also available. Based on RANDOLPH's response that "Cuddy" (Vincent JONES) would not relinquish said firearm, I believed JONES was in possession of at least one .40 caliber firearm but was not willing to give it to RANDOLPH at that time.

43.     On October 15, 2014, at approximately 9:57 p.m., DUBOIS again called Darrell RANDOLPH. During the call, DUBOIS told RANDOLPH, "Man I ain't, where Cuddy? Tell Cuddy I need to see him." Later in the conversation, RANDOLPH told DUBOIS, "Hey yo, where you was at though Sput? You had me ride down there with uhh, with the two joints... I had the umm, old rusty and a .40 on me yo. I rode, I rode on Annapolis." Based on my knowledge, training, and experience, I believed that during this call DUBOIS called RANDOLPH to have him tell JONES ("Cuddy") that he (DUBOIS) needed to speak to him regarding his (JONES') reluctance to give up the .40 caliber firearm earlier in the evening. I also believed that RANDOLPH asked DUBOIS what happened to him because he (RANDOLPH) was riding around looking for him while carrying two firearms ("old rusty and a .40"), an act which RANDOLPH was not pleased about participating in, given its illegal nature. Furthermore, I believed that RANDOLPH eventually acquired the .40 caliber firearm he mentioned from JONES, given that he told DUBOIS he was riding around with it.

44.     On October 15, 2014, at approximately 8:21 p.m., Darrell RANDOLPH received a call from Pernell RANDOLPH.. During the call, Darrell said to Pernell, "Fresh just robbed Marvin, put the gun to his head and all that." Pernell asked, "He robbed Marvin?" Darrell replied "Yeah, and Cuddy acting like he don't want to go get the joint and shit...Marvin in the house, he ain't trying to come outside, he said he wants the joint." Pernell then said, "Oh no, where's Cuddy at? I may tell Cuddy get that for him." Based on my training, knowledge, and experience, I

27

believed that during this call, Darrell RANDOLPH called his brother, Pernell RANDOLPH to inform him that Thomas CHAMBERS ("Fresh") had just robbed Marvin GERMANY at gunpoint. Pernell RANDOPLH informed Darrell RANDOPLH that JONES ("Cuddy") was refusing to get a firearm ("the joint") so that GERMANY could either protect himself or retaliate against CHAMBERS. Based on this call and the previous calls described above, I believe JONES regularly stores firearms for the SMITH DTO at his residence, 22 North Monroe Street, for his and the organization's security and the furtherance of their drug trafficking operations.

45.     On October 20, 2014, at approximately 10:10 p.m., Darrell RANDOLPH received a call from Vincent JONES. During the call, JONES asked RANDOLPH, "Where that joint at man...Where the uh, where'd ya put the charms at man?" RANDOLPH asked, "What, the readies?" JONES replied, "No, where my joint at?" which prompted RANDOLPH to question "the dopes?" JONES then said, "The pack, yeah," RANDOLPH replied, "Alright, I got to call "P" man." JONES said, "Alright man, go ahead and call him yo cause yeah, I need that now. ASAP." Based on their knowledge, training, and experience, agents believe that during the above call JONES was telling RANDOLPH that he needed a fresh pack of twenty-five heroin-filled gelcaps because he had customers ready to purchase them and was under the impression that RANDOLPH had narcotics stashed and ready for distribution. RANDOLPH told JONES that he would have to call Derek SHORTS ("P") to tell him to give a pack to JONES, as SHORTS was keeping the packs at his residence and RANDOLPH was, in fact, out of narcotics at this time.

46.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **22 NORTH MONROE STREET**, the items set forth in Attachment C, which constitutes evidence, fruits and/or instrumentalities of

28

violations of the TARGET OFFENSES, as well as evidence of violations of 18 United States Code Sections 922 and 924.

E.    **4405 MORAVIA ROAD, APARTMENT 2, BALTIMORE, MARYLAND 21206**

47.    The location is described as a three-story, tan brick apartment building. The numerals "4405" are displayed in black above the front exterior glass doors. Apartment 2 is located on the lower floor. The residence is known to be used by Richard SMITH and Tia Buckson, SMITH's female acquaintance.

48.    Ms. Buckson and SMITH have recently travelled on a cruise together, have been surveilled together, and a GPS tracking feature on SMITH's phone placed him in the area of this location on multiple occasions and at all hours of the day, including overnight. Additionally, law enforcement has observed vehicles driven by SMITH parked in front of 4405 Moravia Road at all hours of the day, to include the overnight hours. The apartment is listed in Ms. Buckson's name, which agents know is typical of drug traffickers, insomuch as they typically avoid placing vehicles, residences, etc., in their own names whenever possible to avoid detection by law enforcement. Additionally, Ms. Buckson has this address listed on her Maryland Driver's License and the Baltimore Gas & Electric service at the location is registered to Ms. Buckson and has been since 2005.

49.    Agents observed SMITH exit 4405 Moravia Road on November 6, 2014, at which time he entered a vehicle rented in his name and left the area. While exiting the residence on this specific occasion, SMITH was observed taking the trash out to the dumpster before entering his vehicle. The trash bag SMITH placed in the dumpster was recovered after he left the area and searched. This search resulted in the recovery of a Safeway Grocery Store receipt in the name of

29

"Tia Buckson." Given the layout of the apartment building, it is not possible to observe SMITH exit Apartment 2 without disclosing the presence of law enforcement. However, SMITH has no other ties to the apartment complex aside from Ms. Buckson, a fact which leads agents to believe SMITH resides with Ms. Buckson at 4405 Moravia Road, Apartment 2.

50.     On October 19, 2014, at approximately 1:22 p.m., JEFFRIES received a call from Eldridge DUBOIS. This call was in reference to a dispute between Brian NETTLES aka "Pitt" and a local store operator. During the call, DUBOIS told JEFFRIES, "Man, Pitt in there fucking with yo, in the store man. Threw juice in the window and all that dumb shit man" JEFFRIES told DUBOIS, "Tell that nigga to go home yo." After this exchange, SMITH can be heard in the background with JEFFRIES asking what was happening, while at the same time, NETTLES was telling DUBOIS he (NETTLES) was displeased with DUBOIS for calling JEFFRIES regarding this incident (it should be noted that at the time of this call, SMITH and JEFFRIES were in Miami, FL for a two-day trip of an unknown purpose). During the call, SMITH took control of JEFFRIES phone at the same time NETTLES took DUBOIS' phone, at which time SMITH told NETTLES, "Nah my nigga, you ain't even got no business to be on the block no more. You fired yo." SMITH then told NETTLES to put DUBOIS on the phone again to either confirm or refute NETTLES' version of events and, when DUBOIS refused to support NETTLES' version, SMITH told DUBOIS, "Take whatever he got and send that nigga the fuck home yo... tell that nigga don't come back up there til' Tuesday yo." NETTLES then got back on the phone, at which time SMITH said, "Yo, give them niggas whatever yo got yo and don't come back up that motherfucker til' Tuesday my nigga...Give them the money you got and them motherfucking pills yo... I ain't got no time for that dumb ass shit man."

30

51.     Based on my training, knowledge, and experience, I believed that the above call occurred because NETTLES caused a scene with a local corner-store clerk that resulted in the police being called, which complicates the drug trafficking business in the area and draws unwanted attention. Accordingly, SMITH directed DUBOIS to take all of NETTLES' money and narcotics, and then send him home for the time being. When NETTLES got on the phone, SMITH at first told him the same thing but, after NETTLES protested, SMITH became more forceful with his words and eventually told NETTLES to relinquish his heroin-filled gelcaps ("pills") and any proceeds before leaving the area until Tuesday, the day SMITH was scheduled to return from Miami. Agents know that SMITH's actions are consistent with top-level management of a drug trafficking organization, as it is typically the leader who ultimately makes the personnel decisions, and in this particular case all the parties deferred to SMITH's decision with respect to NETTLES.

52.     On October 23, 2014, at approximately 1:20 p.m., JEFFRIES called Eldridge DUBOIS. During the call, JEFFRIES asked DUBOIS, "Why that money ain't, why that money like that Ock?" DUBOIS asked, "Like what?" JEFFRIES said, "Money for five breads." DUBOIS asked, "What you mean? I, I take mine right?" JEFFRIES told him, "Yeah, you supposed to take three hundred yo... I told you last night, I said yo, Fat Boy said take three more hundred, he said money for two packs...so the bread will be thirteen hundred. He said he only got money for five packs." DUBOIS said, "Relly said somebody hit the wrong fucking stash... yeah, and you know I told him that." JEFFRIES replied, "So he supposed to have eleven hundred then. He said he only have a thousand." Based on my knowledge, training, and experience, I believed the foregoing call between JEFFRIES and DUBOIS occurred because DUBOIS had only given SMITH ("Fat Boy") the sales proceeds from five packs of heroin-filled gelcaps (one thousand dollars, or two hundred

31

dollars per pack) However, SMITH had previously instructed DUBOIS to turn in the money for seven packs, minus DUBOIS' cut of one hundred dollars (fifty dollars per pack), and JEFFRIES informed DUBOIS that SMITH was upset that he was missing money. DUBOIS attempted to explain the shortage by blaming Darrell RANDOLPH, but JEFFRIES said that even if RANDOLPH had lost narcotics, SMITH was still short one hundred dollars and DUBOIS would have to answer for it. Agents are of the belief that SMITH is the final destination for the proceeds of his organization's trafficking activities so he can reinvest the money into more heroin, although presumably after taking his share of the profits.

53.     On November 18, 2014, at approximately 7:54 p.m., and in reference to the search warrant mentioned above in paragraph 20, CARR received a call from Richard SMITH. During the call, CARR asked, "Shit, you already. What it is? What the fuck happened with P?" SMITH replied, "Man, he let that nigga go with like twenty joints... he got four off of him, then he took him in the house." CARR then said, "Then he got the rest of them?" SMITH confirmed by saying, "Out of Uncle Fells' shit, then they went in his house. One of them niggas is telling man... I'm sick about that shit for real. I thought Pumpkin was locked up, we go to tell his girl, she like 'no, he upstairs.'" CARR then asked, "So he just grabbed him and set him down and then, then went and found Unc's shit?" SMITH replied, "Yup. When he tried to go at him, P tried to break on him."

54.     Based on my training, knowledge and experience, I believed that during this call, SMITH called CARR to discuss the events earlier in the day surrounding the search warrant executed at two of the SMITH DTO's stash houses and how, in fact, the police were aware of the secondary location. Additionally, SMITH and CARR discussed why the police let SHORTS ("P", "Pumpkin") go free after catching him with four packs of narcotics on his person. Agents believed

SMITH advised CARR of the situation to both inform him of the incident and that he (SMITH) believed that someone was cooperating with law enforcement. Additionally, it should be noted that at the time of the search warrant and subsequent recovery of narcotics, agents had no idea how many packs of heroin-filled gelcaps had been recovered; they were not counted until later that afternoon, at which time twenty packs filled with twenty-five gelcaps each were accounted for. Agents did not total the amount of narcotics recovered until well after leaving the area and returning to their office and, therefore, could not have inadvertently disclosed the amount to anyone who may have been in the area. As such, for SMITH to know enough to tell CARR that twenty packs were recovered, it would stand to reason that the only sure way for SMITH to know that number would be if he had dropped off that exact amount of narcotics himself (or had one of his lieutenants do it at his direction and with his explicit knowledge). Furthermore, SMITH's recounting of the events to CARR were accurate and prior to the execution of the search warrant, SMITH was observed in a separate vehicle supervising the suspected drop off of narcotics. Given SMITH's level of concern regarding the outcome of the warrant and his knowledge of the exact amount that was recovered, agents believe SMITH to be the operational head of the SMITH DTO, the source of its heroin supply, and the recipient of its sales proceeds.

55.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **4405 MORAVIA ROAD, APARTMENT 2**, the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of the TARGET OFFENSES.

F.      **1821 PENROSE AVENUE, BALTIMORE, MARYLAND 21223**

56.     The location is described as a two-story, red brick, middle-unit row house, with a

33

black metal security door in front of a white door, with a glass pane and gold mail slot cover. The numerals "182" are affixed to the brick left of the front door in white, in a diagonal pattern; the end digit "1" is missing. The ground floor has two windows and a smaller window above the door. The second floor has three windows. The front porch is grey in color and is surrounded by a white fence. This residence is known to be utilized by James BARBER. On December 1, 2014, BARBER was observed on multiple instances entering 1821 Penrose Street without knocking and then exiting same.

57.     On October 31, 2014, at approximately 5:35 p.m., CARR called James BARBER. During the call, CARR told BARBER, "Pretlow owe me one-twenty yo, tell him...Pretlow owe me one-twenty. Tell him we ain't taking no more shorts." BARBER replied, "alright, alright, alright, I'm walking up to him now yo." Based on my knowledge, training, and experience, I believed that during this call, CARR called BARBER to inform him that George PRETLOW (an unindicted associate of the SMITH DTO) owed CARR one hundred and twenty dollars for narcotics sales that he (PRETLOW) had previously conducted. Furthermore, I believed CARR told BARBER to tell PRETLOW that they were not to give any more discounts on narcotics sales ("no more shorts") because they had already given too many discounts that day and it was affecting their profits. Additionally, agents believe BARBER is a mid-level supervisor based on the fact that CARR consistently dispensed orders to him with the intention that BARBER pass those orders on to the street-level workers.

58.     On November 1, 2014, at approximately 4:09 p.m., CARR called James BARBER. During the call, CARR asked "Yo, where you at?" BARBER replied, "In the house." CARR then said, "Alright I'm about to... I'm about to come and grab that." BARBER replied, "Alright."

34

Based on my knowledge, training, and experience, I believed that during this call, CARR called BARBER to ascertain his location, which BARBER indicated as being inside his residence, so that CARR could meet him to retrieve currency acquired from that day's narcotics sales. Based on the call, I believe BARBER routinely takes the daily proceeds from narcotics sales in the house with him after collecting them from the lower-level workers.

59.     On November 4, 2014, at approximately 7:29 p.m., CARR received a call from Kevin GRAY. During the call, GRAY told CARR, "I'm in the crib…I put the joints up yo." CARR replied, "Alright, I'm a see you, I'm a see you, I'm a see you in the morning." GRAY then asked, "Well you, you going, you gonna come get me or you want me to meet you out?" CARR told GRAY, "I gotta find a ride. I probably, I, I, I, gotta, I gotta find. Do you, who got something left?" GRAY replied, "Um, Nook. Nook that um, the, the, the joint. Nook got everything. I told him, I told him take it in the house. I didn't want to leave that shit outside." Based on my knowledge, training, and experience, I believed that during this call, GRAY called CARR at the end of that days' business to notify him that he (GRAY) had taken his remaining narcotics into his residence for the night. When CARR asked GRAY if anyone else had any narcotics ("Who got something left?") GRAY informed CARR that BARBER ("Nook") had taken all the remaining narcotics inside his (BARBER's) house at GRAY's direction because he did not want the narcotics to remain hidden outside.

60.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **1821 PENROSE AVENUE,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of the TARGET OFFENSES.

35

G.    **4119 MARIBAN COURT, BALTIMORE, MARYLAND 21225**

61.    The location is described as middle-unit row home with the numerals "4119"in white to the left of the entry door on a black backing. There is one window to the left of the door on the first floor and two windows on the second floor. The rear of the residence has the numbers "4119" posted vertically to the left of the red entry door. The residence is known to be utilized by Kevin GRAY. On December 8, 2014, GRAY was observed by agents as he exited the rear of 4119 Mariban Court, entered a vehicle driven by an unknown female, and left the area.

62.    On November 3, 2014, at approximately 12:54 p.m., CARR received a call from Kevin GRAY. During the call, GRAY told CARR, "Damn yo, I'm glad I called you at six o'clock and just didn't come straight outside." CARR replied, "Yeah, that's what the fuck you going to always do." Later in the conversation, GRAY told CARR, "I'm down here yo…I gotta go get the, you gotta get the caps out but you wanna stop and get the caps from out uh, out the car, and her job since you right there?" CARR said, "Uhh, I really don't feel like going up there for real" GRAY then stated, "It's nothing down here but half a joint, Nook said one of the joints." Based on my knowledge, training, and experience, I believed that during this call, GRAY called CARR to give him a hard time because he (CARR) was coming out relatively late in the day for a drug trafficker. Furthermore, I believed GRAY called CARR to advise him of the fact that they had sold through most of the heroin they had on hand and would need some more ("it's nothing down here but half a joint") as dictated to GRAY by James BARBER ("Nook"). I believe GRAY's call to CARR informing him of the lack of narcotics is evidence of CARR'S leadership role in the organization and GRAY'S lower-level management role.

63.    On November 4, 2014, at approximately 7:29 p.m., CARR received a call from

Kevin GRAY. During the call, GRAY told CARR, "I'm in the crib…I put the joints up yo." CARR replied, "Alright, I'm a see you, I'm a see you, I'm a see you in the morning." GRAY then asked, "Well you, you going, you gonna come get me or you want me to meet you out?" CARR told GRAY, "I gotta find a ride. I probably, I, I, I, gotta, I gotta find. Do you, who got something left?" GRAY replied, "Um, Nook. Nook that um, the, the, the joint. Nook got everything. I told him, I told him take it in the house. I didn't want to leave that shit outside." Based on my knowledge, training, and experience, I believed that during this call, GRAY called CARR at the end of that days' business to notify him that he (GRAY) had taken his remaining narcotics into his residence for the night. When CARR asked GRAY if anyone else had any narcotics ("Who got something left?") GRAY informed CARR that BARBER ("Nook") had taken all the remaining narcotics inside his (BARBER's) house at GRAY's direction because he did not want the narcotics to remain hidden outside.

64.     On November 5, 2014, at approximately 7:22 p.m., CARR received a call from Kevin GRAY. During the call, GRAY asked CARR, "Where the fuck we put them joints at that we already opened up… I'm talking about the joints that we had already opened?" CARR replied, "it was in the bag." GRAY asked, "In the book bag, right?" CARR confirmed. GRAY then said, "It ain't in there" CARR replied, "You took them out." GRAY then said, "Oh yeah! Yeah, yeah, yeah, I got em." Based on my knowledge, training, and experience, I believed that during this call, GRAY called CARR to ask about the location of the packs of narcotics ("joints") that they had previously started to sell. Apparently, GRAY had forgotten that he had previously removed them from a book bag they were being stored in, a fact which CARR reminded him of.

65.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **4119 MARIBAN COURT,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of the TARGET OFFENSES.

### H.     4306 MAINE AVENUE, GWYNN OAK, MARYLAND 21207

66.     The location is described as a single family, three story, stand-alone house, with white paint and a large wrap-around front porch. There is a white storm door in front of a white main entry door. The numbers "4306" are posted to the left of the main door in white on a dark background. There is also an unattached garage on the property in the rear of the residence with white siding and white garage doors. The residence is known to be utilized by Lisa Fowlkes and an Corey PRAILEAU. This residence is believed to be used as a stash house for bulk narcotics by the SMITH DTO.

67.     On November 18, 2014, a number of calls were intercepted over TARGET TELEPHONE 3 between JEFFRIES and SHORTS. Based on training and experience, agents determined these calls as a prelude to the SMITH DTO getting resupplied with narcotics for the day and, subsequently, these calls led to the search warrant described above in paragraph 20. These calls are summarized below.

68.     On November 18, 2014, at approximately 1:45 p.m., JEFFRIES called Derek SHORTS. During the call, JEFFRIES told SHORTS, "You got your coat and shit on... alright, go sit on um, in like, in like three minutes walk out, go sit on, um, front... on Bmore." SHORTS asked, "I, do I need my bag?" JEFFRIES replied, "No, no, no you just gonna put, you know I mean." SHORTS said, "Oh ok, alright." JEFFRIES then said, "I said you might have to get one of

em little homies so he can put up too." SHORTS responded, "Yeah, so that's why I say do I need my book bag, my book bag?" JEFFRIES told him, "Well, I was saying up to you, however you want to do it." Based on my knowledge, training, and experience, I believed the above call was placed to SHORTS to notify him that a narcotics resupply would be coming to him shortly and he would be expected to pick up the narcotics and conceal the narcotics once he had possession of them.

69.     As a result of the above call and calls prior to it, agents set up surveillance of the 1900 block of West Baltimore Street. At approximately 1:54 p.m., agents observed SHORTS exit his residence and walk across the street. Shortly thereafter he was instructed, through an intercepted call, by JEFFRIES to walk back across the street, which agents observed.

70.     At approximately 1:59 p.m., agents observed a silver 2005 Honda Odyssey minivan bearing Maryland License Plate 9BP6688, registered to Lisa Fowlkes at 9007 Bruno Road, Randallstown, Maryland, pull into the block and park directly in front of 1914 West Baltimore Street, which is SHORTS' residence. The van was driven by an individual later to be determined to be Corey PRAILEAU, an unindicted associate of the SMITH DTO. As the van parked, agents were able to observe a second vehicle pull directly behind the van and park as well. That vehicle was a Chevrolet Malibu rented to Richard SMITH, who was observed sitting in the passenger side of same. Agents were not able to determine who was driving SMITH. Immediately after the vehicles parked in front of 1914 West Baltimore Street, agents observed SHORTS approach the passenger side of the van, lean inside, and then quickly walk away with a bulge in his sweatshirt pocket that was not previously present. SHORTS then walked directly into 1930 West Baltimore Street, a vacant house. As soon as SHORTS entered 1930 West

39

Baltimore Street, the minivan and the Malibu drove away. Approximately two minutes later, SHORTS was observed walking back into his residence, 1914 West Baltimore Street.

71.     At approximately 2:13 p.m., JEFFRIES called SHORTS. During the call, JEFFRIES told SHORTS, "Yo, bring four of em yo, just, um, want just bring four packs. Not eight. Four... hurry up, cause I need them yo." SHORTS replied, "Alright." Based on my knowledge, training, and experience, I believed that JEFFRIES called SHORTS to tell him to bring four packs of narcotics around the corner so that the SMITH DTO sellers could be resupplied.

72.     At approximately 2:14 p.m., agents observed SHORTS exit his residence, enter 1930 West Baltimore Street for approximately thirty seconds, then walk eastbound on West Baltimore Street.   It was at that time that agents stopped SHORTS, believing he was in possession of narcotics. SHORTS attempted to run and discard narcotics, but he was stopped shortly thereafter and one hundred gelcaps containing suspected heroin were recovered.   With SHORTS in custody, a search of the vacant building, 1930 West Baltimore Street, was conducted. That search resulted in the recovery of four hundred more heroin-filled gelcaps and assorted ammunition.

73.     Based on all of the above, agents began researching PRAILEAU and the silver Honda Odyssey minivan that supplied SHORTS with the five hundred heroin-filled gelcaps. While the van was registered to Ms. Fowlkes at 9007 Bruno Road, Randallstown, Maryland, agents were never able to observe the vehicle at that address. A check of the "Accurint" public database revealed that Ms. Fowlkes had a current address listed as 4306 Maine Avenue, Gwynn Oak, Maryland.   As such, agents began conducting surveillance at that address.   On November 25, 2014, agents observed the same 2005 Honda Odyssey minivan parked on the street in front of

40

the residence, along with a Chevrolet SUV with Tennessee license plates sitting on a parking pad in the rear of the residence. Later on the same date, agents observed Ms. Fowlkes arrive at the residence and enter same with an adolescent child.

74.     On November 26, 2014, agents were able to observe PRAILEAU as he drove the Honda Odyssey minivan and parked it in front of 4306 Maine Avenue, at which time PRAILEAU exited the driver's side, opened the passenger door so an adolescent child could exit, and waited while that child entered the residence before driving away.

75.     On December 1, 2014, agents were conducting surveillance of 4306 Maine Avenue when they observed PRAILEAU pull into the block while driving the Chevrolet SUV with Tennessee plates, at which time he parked in front of the residence.   PRAILEAU was slow to exit the vehicle and, once out of it, he gave a long look to the agents' car that was parked in the block. PRAILEAU then walked onto the porch of 4306 Maine Avenue, where he waited for a few minutes while looking furtively around, and again gave a long look to the agents' car that was parked in the block.   PRAILEAU eventually walked to the front door, removed a package from the mailbox, and then clearly entered the residence. Based on my training, knowledge, and experience, I know that drug traffickers typically act in a similar fashion to PRAILEAU, insofar as they are careful in their movements and vigilant regarding their surroundings when conducting illicit activities and accessing residences they are trying to conceal from law enforcement.

76.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **4306 MAINE AVENUE,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of the TARGET OFFENSES.

41

**I.     1917 WEST FAYETTE STREET, BALTIMORE, MARYLAND 21223**

77.    The location is described as a two-story, tan brick row home. The numerals "1917" are displayed in the window above the black front door. The residence is known to be utilized by Eldridge DUBOIS. On December 9, 2014, I stopped and spoke with DUBOIS while he was standing near 1840 West Fayette Street. I asked him where he lived and he said he resided at 1917 West Fayette Street and, when I advised him to go home, DUBOIS was seen walking into the 1900 block of West Fayette Street. He also uses 1917 West Fayette Street on his Maryland Driver's License.

78.    On October 31, 2014, at approximately 9:05 a.m., JEFFRIES called Eldridge DUBOIS. During the call, JEFFRIES asked DUBOIS, "You gave him four right?" DUBOIS replied, "Yeah." JEFFRIES said, "I had three, so at least two more out there" DUBOIS responded, "Alright, well that's Cuddy. Cuddy on his way out. He's done so uh, send yo around here." Later in the call, as JEFFRIES was complaining that none of the workers were outside selling narcotics, he told DUBOIS, "None of them niggas was outside like I said yo, none of them" DUBOIS replied, "Well, we can't let this money go to waste either. Can't let nobody else get it." Based on my knowledge, training, and experience, I believed that during this call, JEFFRIES called DUBOIS to ask how many packs of narcotics he had sold and how many were still left for sale, so that JEFFRIES could get a more accurate picture of narcotics needed for the day's supply. DUBOIS informed JEFFRIES that he himself had sold everything that was in his possession and Vincent JONES ("Cuddy") only had proceeds left from his sales, which is why DUBOIS told JEFFRIES to notify SHORTS to provide more narcotics for distribution ("send yo around here").

79.    On November 1, 2014, at approximately 2:25 p.m., JEFFRIES called DUBOIS.

During the call, JEFFRIES told DUBOIS, "That shit was twelve dollars off yo... when I put it together it came up to thirteen eighty-eight, it supposed to count fourteen hundred." When DUBOIS acknowledged the missing money, JEFFRIES said, "Tell them niggas, one of them niggas they have short money man... tell them niggas to get six dollars apiece for that shit man." DUBOIS replied, "Alright, well say no more." Based on my knowledge, training, and experience, I believed that during this call, JEFFRIES called DUBOIS to inform him that the narcotics proceeds he (DUBOIS) had just dropped off to JEFFRIES were short twelve dollars and, accordingly, the sellers who shorted it would need to make it up the shortage. JEFFRIES call to DUBOIS' and DUBOIS' acknowledgement of the situation, indicates that DUBOIS is most definitely a supervisor in the SMITH DTO that is responsible for money collection, drug distribution, and street-level employee supervision.

80.    On November 2, 2014, at approximately 6:37 p.m., Bruce JEFFRIES called DUBOIS. During the call, DUBOIS asked JEFFIRES, "Alright. Hey yo, he's already huh?" JEFFRIES replied, "What's wrong?" DUBOIS told him, "Nothing, we try, trying and get it straight. Try and make sure everybody right before I leave. So I might be needing you make that call for me." JEFFRIES told DUBOIS, "Shit, I ain't making, you know what I'm saying. It's already um, it's already, it's still three out there." DUBOIS replied, "There's still three out there? Alright, it's two, it's two." When JEFFRIES said, "No hell no, ain't no two." DUBOIS replied, "I got money for one." Later in the conversation, DUBOIS told JEFFRIES, "Alright, and they ready to be gone yo... you already know what I'm saying. If they ready be gone you know what I'm talking about." JEFFRIES said, "Oh they gonna be gone gone or they gonna have something left over?" When DUBOIS replied, "No, they gonna be gone." JEFFRIES told him, "Yeah nigga, get

that shit in the morning then... you might as well get that shit in the morning." Based on my knowledge, training, and experience, I believed that during the above call, DUBOIS called JEFFRIES to tell him that the SMITH DTO workers were about to be done selling all the narcotics they had and would need more, further indicating that he had the proceeds from the sale of one pack of narcotics and the other two remaining packs were almost gone. Furthermore, I believed that DUBOIS requested JEFFRIES resupply the workers before he (DUBOIS) left for the night so they could continue to sell narcotics, however, JEFFRIES told DUBOIS that once the remaining narcotics were gone, they would be done for the night and DUBOIS could resupply the workers the following morning.

81.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **1917 WEST FAYETTE STREET,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of the TARGET OFFENSES as well as violations of 18 United States Code, Sections 921 and 924.

### J.     3919 WEST MULBERRY STREET, BALTIMORE, MARYLAND 21223

82.     The location is described as a two-story, red brick row home, with orange tiles at the roof line. The front porch is black with white trim. The numerals "3919" are displayed above the front door. The white front door with red trim is behind a black security door. The residence is known to be utilized by Walter TIMMONS, who uses the address on his Maryland Driver's License. TIMMONS was observed entering/exiting the residence most recently on November 10, 2014. When he was stopped by agents on December 4, 2014, TIMMONS provided them with 3919 West Mulberry Street as his address.

44

83.    On November 11, 2014, at approximately 9:15 p.m., CARR received a call from Walter TIMMONS. During the call, TIMMONS asked CARR his whereabouts, and CARR said, "I'm in the crib... who the fuck down there?" TIMMONS replied, "Me, Dummy and Sput." CARR then asked to speak to DUBOIS ("Sput"), at which time he told DUBOIS, "Hey yo, grab that bread real quick... it's a hundred dollars down there, grab it real quick... On Fairmount. Money and Nook." DUBOIS asked, "you say grab it from them?' CARR replied, "Yeah, grab it from them." DUBOIS later asked, "You say Money got fifty and Nook got fifty?" CARR responded, "Money got forty." Based on my knowledge, training, and experience, I believed that during this call, CARR asked TIMMONS who from the SMITH DTO was out selling narcotics on the block, to which TIMMONS replied it was only himself, BARBER and DUBOIS. When CARR spoke to DUBOIS, CARR told him to grab the narcotics proceeds ("bread") from TIMMONS and BARBER, who were each currently holding on to money that CARR needed for himself.

84.    On November 26, 2014, at approximately 10:27 a.m., CARR received a call from TIMMONS. During the call, CARR told TIMMONS, "I'm out front yo." TIMMONS replied, "Alright. You gotta come help me with this shit." CARR then told TIMMONS, "Alright. Unlock the door." Based on my knowledge, training, and experience, I believed that during this call, CARR went to TIMMONS' residence, 3919 West Mulberry Street, so that the two of them could package heroin for distribution that day. Based on the call, agents believe TIMMONS needed CARR's help to cut the heroin properly before packaging it.

85.    On October 21, 2014, during surveillance conducted by investigators, TIMMONS was observed in and around the SMITH DTO's central area of operations as he commiserated with numerous other members of the SMITH DTO; namely CARR, both RANDOLPH brothers,

45

COATES, GILLIARD, JEFFRIES, and SMITH, among others. During that surveillance, TIMMONS was observed conducting numerous hand to hand narcotics transactions with customers as they both drove through and walked into the area. TIMMONS was also observed giving U.S. currency to CARR, in what agents believe was TIMMONS handing his narcotics proceeds off to his supervisor. Additionally, TIMMONS has been observed operating with the SMITH DTO on numerous other occasions, as recently as November 25, 2014.

86.     On three occasions, an undercover ATF TFO purchased narcotics directly from TIMMONS. The dates of the purchases were October 7, October 10, and October 24, 2014. During those purchases, the undercover TFO purchased thirty-three, thirty-nine, and sixty-one gelcaps of heroin, respectively, and obtained a cellphone number from TIMMONS that matched the number listed above (443-527-7378).

87.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **3919 WEST MULBERRY STREET,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of the TARGET OFFENSES.

K.     **1840 WEST FAYETTE STREET, BALTIMORE, MARYLAND 21223**

88.     The location is described as a two-story, red brick, middle-unit row house, with a white front door. "1840" is affixed on the door in black numerals. The ground floor has two windows and a smaller window above the door. These windows have black security bars on them. The residence is known to be utilized by Timon MCRAE and Raekwon CALDWELL, two unindicted associates of the SMITH DTO. MCRAE is a narcotics seller that operates under BARBER, GRAY, TIMMONS and CARR. CALDWELL is a narcotics seller that operates under

46

Bernard KINGSBOROUGH. MCRAE was observed exiting 1840 West Fayette Street on December 4, 2014. Both CALDWELL and MCRAE use 1840 West Fayette Street for official Baltimore City Court proceedings.

89.     MCRAE was observed during surveillance on October 21, 2014, during which he was seen commiserating with numerous other members of the SMITH DTO while they were distributing narcotics. On that day, MCRAE was observed acting as a lookout for TIMMONS and others while they were selling heroin throughout the entirety of the surveillance.

90.     On November 28, 2014, while conducting surveillance in the area, MCRAE was observed, over the course of a few hours, with BARBER and an unknown male as they sat on the steps of 1840 and 1842 West Fayette Street. As agents drove around the area, they constantly saw MCRAE walking back to the steps and/or front sidewalk of 1840 and 1842 West Fayette, as if he had just come from across or down the street. On two occasions, agents observed MCRAE walking back towards his residence, 1840 West Fayette Street, after he had just appeared to conduct CDS transactions with unknown individuals. Given the high level of narcotics activity in the area and the frequency with which the parties repeated this activity, agents believed that MCRAE, BARBER, and the unknown male, were distributing narcotics from the front steps and sidewalk area of 1840 West Fayette Street, however the agents were unable to see any such transactions due simply to poor timing.

91.     In addition to surveillance of MCCRAE, he was intercepted over TARGET TELEPHONE 4 on one occasion speaking to CARR (it should be noted that MCCRAE was in jail on an unrelated pending matter for much of the wire, hence the lone interception near the end of the Title III phase). On November 21, 2014, at approximately 10:05 p.m., CARR utilized

47

TARGET TELEPHONE 4 to place a call to 443-673-7239, utilized by MCCRAE. During the call, CARR asked, "Nephew, what it is... fuck you at?" MCCRAE replied, "On the 18." CARR then asked, "Oh alright. Did you already do that yet?" MCCRAE replied, "You talking about Fat Boy?" When CARR confirmed the question, MCCRAE said, "Nah, not yet cause, you know, I just came out." CARR then told MCCRAE, "Alright, alright. Be careful dummy. Just hit me." Based on my knowledge, training, and experience, I believed that during this call, CARR called MCCRAE to initially ask where he was, while agents believe that based on his response, MCCRAE was standing in the 1800 block of West Fayette ("the 18"). Furthermore, I believed CARR asked MCCRAE if he had met with Richard SMITH ("Fat Boy") so he (MCCRAE) could provide him with proceeds from narcotics sales. I believed MCCRAE's response that he had not met with SMITH because he "just came out" is MCCRAE advising CARR that he had only just begun to sell narcotics and, therefore, he did not have money for SMITH just yet.

92.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **1840 WEST FAYETTE STREET,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of the TARGET OFFENSES.

## L.     4329 CREST HEIGHTS ROAD, BALTIMORE, MARYLAND 21215

93.     The location is described as a two-story, red brick row home, with a white/ glass storm door, and an interior white door. The numerals "4329" are displayed to the left of the front door in black and white. The front door is white. The residence is known to be utilized by Marvin GERMANY, who uses the residence for official Baltimore City Court proceedings. GERMANY was seen at the residence as recently as November 25, 2014, when he was interviewed by agents

48

regarding his involvement as the victim of an armed robbery.

94.     On September 27, 2014, at approximately 2:38 p.m., Darrell RANDOLPH received a call from JEFFRIES. During the call, GERMANY answered RANDOLPH's phone and told JEFFRIES, "No, this Marvin yo. Relly went to go play basketball or something... ya but that last one done. But he got the other half cause we was doing it together and he left." Based on my knowledge, training, and experience, I believed that during this call, JEFFRIES initially called RANDOLPH to inquire how the daily sales were going. When GERMANY answered, JEFFRIES was initially annoyed but was able to get the same information from GERMANY; which was that GERMANY had sold through the majority of the packs of narcotics that he had been given, except for half of a pack that RANDOLPH had taken with him.

95.     On October 3, 2014, at approximately 3:21 p.m., Darrell RANDOLPH called GERMANY. During the call, RANDOLPH told GERMANY, "Come on yo, Mo said she ready." GERMANY said, "I'm getting the rest of the shit yo." Based on my knowledge, training, and experience, I believed that during this call RANDOLPH called GERMANY to tell him to hurry up and bring the heroin gelcaps to him because he (RANDOLPH) had a customer named "Mo" who was ready to buy narcotics. Furthermore, I believed GERMANY's response indicated that, at that time, he was in possession of all the heroin and, as such, was the reason why RANDOLPH was waiting on him to complete the sale.

96.     On October 6, 2014, at approximately 7:31 p.m., Darrell RANDOLPH received a call from GERMANY. During the call, GERMANY told RANDOLPH, "Hey yo I'm letting you know right now yo, so you don't try to come at me sideways yo. Yo told me give everybody one. Um, you got a problem you gotta take it up with him, cause Cuddy and Perc just told me that they

49

needed one. You know I'm getting one, so it's only four left. He told me give everybody one, I'm just letting you know." RANDOLPH replied, "Hold on, I'm about to call him now." Based on my knowledge, training, and experience, I believed that during this call, GERMANY notified RANDOLPH that JEFFRIES ("Yo") had given him instructions to hand out packs of narcotics to Vincent JONES ("Cuddy") and Pernell RANDOLPH ("Perc") and, therefore, there would be fewer packs for Darrell RANDOLPH to distribute himself. Additionally, I believed GERMANY told RANDOLPH that he himself would be distributing at least one of the packs of narcotics, further cutting into what RANDOLPH would have at his disposal for distribution.

97.    Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the SUBJECT LOCATION, **4329 CREST HEIGHTS ROAD,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of the TARGET OFFENSES.

## VI.    "NO KNOCK" REQUEST"

97.    Your affiant submits the following facts in support of a "no-knock" warrant for the locations located at **24 North Monroe Street, Baltimore, Maryland,** known to be the residence of Darrell and Pernell RANDOLPH, as well as the location at **22 North Monroe Street, Baltimore, Maryland** (SUBJECT LOCATIONS C & D, respectively) known to be the residence of Vincent JONES. I believe the factors below, coupled with the factors referenced above in the search warrant affidavit, are evidence enough to issue a "no-knock" warrant for both of these locations.

98.    Your affiant knows that Vincent JONES, Darrell RANDOLPH and Pernell

50

RANDOLPH have been intercepted over the Title III wiretap discussing their possession of firearms, as well as their employment of firearms for both offensive and defensive purposes. As evidenced in paragraphs 36 through 38 and 41 through 45, I believe that JONES and the RANDOLPH brothers maintain firearms in their residence to protect their narcotics, narcotics proceeds, and their distribution territory from encroachment by outside entities. In addition to the calls referenced above, Darrell RANDOLPH was intercepted a number of times over the Title III wiretap having conversations with some of his narcotics customers during which he was working out a trade whereby he would receive firearms in exchange for a quantity of his narcotics. In addition to the conversations intercepted over the wiretap, I have had discussions with local-area BPD detectives who are familiar with the SMITH DTO, and JONES and the RANDOLPH brothers in particular. Based on these discussions, your affiant knows that JONES and the RANDOLPH brothers are believed by these local area detectives to maintain, carry, and make use of firearms on a regular basis, a fact which is supported by the intercepted calls.

99. Your affiant also knows that drug traffickers in general typically maintain firearms in their residences in a location such that they are readily accessible. They typically keep firearms nearby for quick access because of the prevalence of home-invasion style robberies that typically occur when drug traffickers target other drug traffickers for their proceeds and narcotics. Additionally, they keep firearms nearby for quick access in the event that someone attempts to rob them or their associates while on the street. Given the centralized location of SUBJECT LOCATIONS C & D with regards to the SMITH DTO's main area of operations, I believe that these two locations are those within which the SMITH DTO stores their firearms, in addition to firearms that JONES and the RANDOLPH brothers maintain for themselves.

51

100.   Your affiant knows that law enforcement officers could wait for Vincent JONES, Darrell and Pernell RANDOLPH to exit their respective residences before arresting them and subsequently conducting search warrants at their locations. However, there are twelve search warrants and fourteen arrest warrants being conducted in this investigation, all of which will be served simultaneously. Furthermore, seven of the search warrants are within six blocks of each other, while the two locations requested for "no-knock" warrants are adjacent properties to one another. Were the other search warrants to be executed before the search and arrest warrants at SUBJECT LOCATIONS C & D were executed, it is extremely likely that a SMITH DTO member or someone associated with JONES or one of the RANDOLPH brothers would call to notify them of the events occurring elsewhere throughout the neighborhood. Were any of the three individuals in question allowed to find out about the activities of law enforcement elsewhere, I believe they would immediately realize they would be arrested in short order as well, and would act to destroy evidence critical to this investigation and/or prepare themselves for the arrival of law enforcement by acquiring firearms and/or other weapons.

101.   In sum, the swift entry allowed by a "no-knock" warrant would enable law enforcement to conduct a forced entry without giving the suspects inside any time to acquire firearms or weapons, or destroy evidence vital to this investigation. I believe the forgoing facts surrounding Vincent JONES, Darrell RANDOLPH and Pernell RANDOLPH, regarding their frequent possession and employment of firearms is evidence enough that a "no-knock" warrant is necessary for the residences located at **24 North Monroe Street, Baltimore, Maryland and 22 North Monroe Street, Baltimore, Maryland** (SUBJECT LOCATIONS C & D, respectively) and, as such, I humbly ask this court to issue said warrants.

## VII.   <u>CONCLUSION</u>

102.   Based upon the evidence presented herein, your affiant believes there exists probable cause to believe that the TARGET SUBJECTS identified above are engaged in on going federal narcotics violations prohibited under, Title 21 U.S.C. §§ 841 and 846, and that evidence related to those violations will be located within the locations described herein.

103.   Attached to each search warrant application and search warrant is an ATTACHMENT A, which provides the same detailed description above for each of the properties to be searched.

104.   Also attached to this affidavit are ATTACHMENT B and ATTACHMENT C referenced herein.   In summary, those attachments list items your affiant expects to be found within specific locations; to include firearms, drugs, drug paraphernalia, documents and records, proceeds of the illegal activity and assets.

105.   Given the confidential nature of this continuing investigation, I respectfully request that this affidavit and all of the documents submitted herewith be maintained under seal until otherwise ordered by this Court.

14-2874SAG   and   14-2885SAG

WHEREFORE, in consideration of the facts presented, I respectfully request that this

Court issue a search warrant for each of the SUBJECT LOCATIONS and authorize the search and

seizure of the items described in the respective attachments hereto.


Special Agent Timothy Moore
Bureau of Alcohol, Tobacco, Firearms & Explosives


Sworn to before me this 15 day of December, 2014


Stephanie A. Gallagher
United States Magistrate Judge


54